## Louisville & Nashville Railroad Company v. Parker's Administrator.

(Decided June 18, 1915.)

### Appeal from Knox Circuit Court.

1. Railroads—Action for Death of Employe—Pleading.—Where in an action by the personal representative of a deceased employe of a railroad company for damages, the petition is based wholly upon the idea that the decedent at the time of his injury was engaged in intrastate commerce, the plaintiff will not be required to set forth in terms in his pleading whether he was proceeding under the State Law or the Federal Act.

2. Railroads—Intrastate Commerce.—Where a switch crew at the time of an injury to a fireman on a switch engine was engaged in switching an intrastate car from one part of the yard to another, but expected shortly to switch an interstate car from one part of the yard to another, and was at the time engaged in switching the intrastate car so that it might ultimately get at, so as to switch to another track the interstate car, they were engaged in intrastate commerce.

3. Railroads—Test As To Whether Engaged In Interstate or Intrastate Commerce.—The true test whether an employe is at a particular time engaged in intrastate or interstate commerce is what character of commerce was he actually engaged in at the time of his injury, and not whether he was engaged at that time in one kind of commerce as a preliminary to the engagement in another kind.

BENJAMIN D. WARFIELD and BLACK, BLACK & OWENS for appellant.

J. M. ROBSION for appellee.

OPINION OF THE COURT BY JUDGE TURNER—Affirming.

On the 30th of June, 1913, plaintiff's intestate, Edward Parker, while engaged as a fireman on a locomotive engaged in switching service in the yards of appellant at Middlesboro, Kentucky, was killed, and his administrator instituted this action against the company for damages, alleging that his death was brought about through its negligence.

Upon a trial in the circuit court a verdict for $7,000.00 for the plaintiff was returned, upon which judgment was entered, and the company has appealed.

The original answer of the defendant consisted merely of a denial of the material allegations of the pe-

tition, but it subsequently filed an amendment, wherein it set up a plea of contributory negligence, and afterwards, during the trial, tendered a second amended answer, amplifying the plea of contributory negligence, but the court refused to permit the second amendment to be filed.

The evidence showed that in the yards of appellant at Middlesboro there were eleven tracks or switches, and that track No. 11 is known as the "lead track" from which and into which all of the other ten tracks or switches lead. On the night of the injury, and some time before, the switching crew made up a local freight train, No. 86, which ran between Middlesboro, Ky., and Corbin, Ky., and the same was left standing on track No. 11 preparatory to being carried out the next morning. A caboose was attached to the rear of this train and was left standing on track No. 11 near to where it intersects with track No. 10, but not in the clear of engines or cars that might be run into track No. 10 from the other end of track No. 11. While this train, No. 86, and the caboose attached to it were so standing on track No. 11 the switching engine, upon which decedent was engaged as fireman, was directed to go into track No. 10 from track No. 11, and while so going into track No. 10, Parker, while standing or sitting at his window in the cab of the engine, and possibly leaning out of the same, was struck on the head by coming in contact with the caboose or the marker attached thereto, and was killed.

No one saw Parker at the time he was struck, but immediately afterwards he was found astraddle of his stool or bench and his body leaning about half-way out of the cab window. There was no injury upon any part of his body except his head, blood was found on both the engine and the caboose, the caboose showed signs of the collision, and the hand-rail of the engine was bent.

We entertain no doubt from the evidence that the caboose was not in the clear of an engine passing into track No. 10 from track No. 11, and that this was the cause of Parker's death.

It is apparent that at the time of the accident Parker's head was outside of the cab window, but it is shown by the record, and is admitted, that it was the duty of the fireman to keep a lookout for signals and convey them to the engineer; and while it is claimed for appellant that a short time before the accident Parker was

'seen with his head resting in the window and apparently asleep, there is other evidence tending to contradict this theory, and the jury was justified in finding from all the evidence and all the facts that he, at the time of the injury, was engaged in the line of his duty.

The plaintiff's pleadings were based wholly upon the idea and assumption that Parker, at the time of his injury, was engaged in intrastate commerce, and that his administrator was entitled to recover under the State law. The appellant, however, before it filed its answer, entered a motion to require the plaintiff to make his petition more definite and specific, and set forth in terms whether he was proceeding under the State law or the Federal act. The court properly overruled this motion, for the plaintiff's petition upon its face clearly indicated that he was proceeding under the State law, and upon the assumption that the intestate was at the time of his death engaged in intrastate commerce. That this action of the court was not prejudicial to appellant is apparent when it is considered that if at the conclusion of the testimony it had developed that Parker at the time of his injury was engaged in interstate commerce there could have been no recovery, and appellant would have been entitled to the peremptory instruction for which it asked.

The controlling question in this case is whether or not at the time of his injury Parker was engaged in interstate commerce, for, if he was, it is conceded by the attorney for the appellee that there can be no recovery. This question must be determined from the testimony of the yard foreman or conductor who had charge of the movement of all cars in the yard and one other witness, a brakeman, who testifies as to the destination of the car which was attached to the engine at the time of the injury. This brakeman on this point testifies as follows:

"Q. What were you going to do with the car you were putting in No. 10? A. I think it was going to Mr. Hoe. Q. Who is Mr. Hoe? A. He runs a business. Q. It was being put there in Middlesboro? A. Yes, sir."

The yard foreman, Town, on this subject testifies as follows:

"Q. What work did you and the yard crew have to do, and were you preparing to do at the time Parker was injured? A. We were down, going in No. 10 to get

out a merchandise car for 89, a full car for No. 4 track and an empty box car for No. 5, and also had hold of the box car I was taking off there with me that was to the Furnace Mills. Q. A merchandise car for 89, what is that? A. A south-bound local freight train that leaves Middlesboro in the morning. Q. Where does it go? A. Middlesboro to Norton, Virginia. Q. Do you remember the number of the merchandise car that you were getting off that was to be put in train 89 running to Norton? A. I do not like to make a sworn statement; it was M. C. 13406, or 13506, or 13306. Q. Refer to your records, if you have them, and tell the jury the exact number and name of the car for which you were going and when it was to be placed in train 98? A. M. C. 13908. Q. Do you know of your own personal knowledge as to what that car had in it? A. Had various articles; shipments of everything in it for points on the south end of the C. V. division; at least, that was my remembrance; it was a merchandise car. Q. Did you see the way bills? A. No, sir; I did not handle the way bills. Q. Of course, you did not open the car? A. No, sir. Q. Do you know it was a merchandise car for some point in Tennessee or Virginia? A. Tennessee or Virginia. Q. Where was that car that contained that merchandise destined for, points in Virginia or Tennessee? A. It was down some 12 or 15 car lengths down on track No. 10. Q. The same crew with which your engine was moving, on the same track on which your engine was moving at the time Parker was injured? A. Yes, sir. Q. Tell the jury whether or not it was or was not part of the duties of the yard crew of which Parker was a member to take and place this car containing this merchandise for Virginia and Tennessee on train 89 destined for these points? A. Yes, sir. Q. Do you know from the billing or from your personal knowledge where this car had come from or in what train it came to Middlesboro? A. It came to Middlesboro in train 89, the night previous to my handling. Q. Between what points did train 85 run? A. From Corbin, Kentucky, to Middlesboro, Kentucky. Q. Where was M. C. 13908 placed, in what train? A. Train 89. Q. If I understand you, you went into track No. 10 and intended to move this car for train 89 at the time Mr. Parker was injured? A. Yes, sir. Q. Tell the jury whether or not this car did go into train 89 that run between Middlesboro and Norton, Virginia?

A. Yes, sir. I placed the car in train 89, whether it departed from Middlesboro on that date, I cannot say. Q. Tell the jury whether or not taking this car from track 10 and placing it in train 89 was a part of the work assigned to you and the yard crew of which Parker was a member on the night on which Parker was injured? A. Yes, sir. Q. Tell the jury whether or not that car was on the original switch list which you received at or prior to the time you and the other members of the crew went on duty that night? A. Yes, sir."

Again on cross-examination he says:

"Q. At the time Parker was killed the engine was backing into 10 approaching a box car? A. Yes, sir. Q. What box car was that? A. It was an L. & N. empty going to J. R. Hoe, I believe it was consigned. Q. That a place in Middlesboro? A. Yes, sir. Q. In this State? A. Yes, sir. Q. And where was this train going that was in 11; No. 86 train and caboose? A. It was going to Corbin the next morning. Q. Middlesboro is a freight division point is it? A. It is a sub-division for locals. Q. Local freights run between Middlesboro and Corbin, Ky.? A. Yes, sir. Q. Freight locals that run from Middlesboro to Norton, Virginia? A. Yes, sir. Q. And these two local divisions make up the C. V. division? A. Yes, sir; Middlesboro is a sub-division. Q. I notice this car you say 13908 M. C. on your card that you have introduced here, which you say was the instructions given you that night, and under another division of the car it reads, under the head of the division of destination, it reads 89? A. Yes, sir. Q. What does that mean? A. That car goes on 89. Q. So far as your crew was concerned and so far as Parker was concerned, if that was to be moved at all, it was to be moved from No. 10 to 89 train? A. Yes, sir. Q. And that was its destination so far as your crew was concerned? A. Yes sir. Q. But that car was not moved that night before Parker was killed; I mean car 13908, M. C. 89; it was not moved that night before Parker was killed? A. No, sir. Q. So what you are talking about this car 13908 M. C., destination 89, tonnage 10, that was a car you moved after Parker was killed, and put it into 89 train? A. Yes, sir. Q. This car that was attached to the engine, where did you put it after Parker was killed? A. I taken it along up in the morning after some time between that time and time I was quitting next morning, taken it over to the

furnace. Q. That is in Middlesboro? A. Yes, sir. Q. And near these yards? A. Yes, sir. Q. How many cars were between it and the car you were moving for the local trade, there at Middlesboro, and this car 13908, M. C. 89? A. 12 or 15; might have been that many, I do not know the exact number.''

As we gather from this testimony, at the time of the injury to Parker the engine upon which he was at work was attached to a single empty car, the destination of which was within this State; that the engine and this car were at the time going into track No. 10 for the purpose of removing some 12 or 15 cars, which were on that track, which had to be removed before the interstate car could be reached and placed on another track in a train so that it might proceed upon its interstate journey. In other words, at the time of the injury only an intrastate car was attached to the engine, and the engine was engaged in switching this intrastate car from one part of the yard to another, and expected shortly thereafter to remove from track No. 10 some 12 or 15 cars so that it might switch the interstate car to another track. That is, it was engaged at the time in switching intrastate cars so that it might ultimately get at and switch to another track the interstate car.

As a matter of practical knowledge, we know that in railroad switching-yards the switch engines are constantly engaged in switching both interstate and intrastate cars, and if it can be said as a matter of law that the crew of a switch engine, which is actually engaged in moving intrastate cars as preliminary to the ultimate moving of interstate cars, is then engaged in interstate commerce, there would never be a time when a switching crew would not be engaged in such commerce, in any railroad yards of any size. If a switching crew may be held to be engaged in interstate commerce when it is only handling intrastate cars, merely because the yard foreman has orders some time during that day or night to remove an interstate car from one part of the yard to another, and the removal of the intrastate cars is to be held merely preliminary to the ultimate removal of the interstate car, we are at a loss to understand when and under what circumstances such a crew could be held to ever be engaged in intrastate commerce.

The true test is what character of commerce was the employe engaged in at the time of his injury, and not whether he was engaged at the time in one kind of commerce as a preliminary to the engagement in another kind.

Suppose at the time of Parker's injury there had been attached an interstate car to the engine, and it was being switched from one part of the yard to another with the preliminary purpose of removing an intrastate car from one part of the yard to another, would a contention'that it was then engaged in intrastate commerce merely because of the purpose in the near future to so engage be considered for a moment?

The case of North Carolina Railroad Co. v. Zachary, 232 U. S., 248, is not in conflict, as we understand it, with the views herein expressed. In that case a fireman on an engine which had already been prepared by him for an interstate journey and was about to depart, was killed while he had temporarily left his engine a short time before its departure. The court in that case, 'n holding that the fireman was engaged in interstate commerce, said:

"It seems to us, however, that his acts in inspecting, oiling, firing, and preparing his engine for the trip to Selma were acts performed as a part of interstate commerce, and the circumstance that the interstate freight cars had not as yet been coupled up is legally insignificant. See Pederson v. Del. Lac. & Western R. Co., 229 U. S., 146, 151; St. Louis & San F. Ry. v. Seale, 229 U. S., 156, 161."

The case of Illinois Central R. R. v. Behrens, 233 U. S., 473, is very much like this. There the employe was engaged in switching intrastate cars, but was expected shortly to be engaged in interstate commerce. The court, in holding that he was engaged only in intrastate commerce, said:

"Giving to the words 'suffering injury while he is employed by such carrier in such commerce' their natural meaning, as we think must be done, it is clear that Congress intended to confine its action to injuries occurring when the particular service in which the employe is engaged is a part of interstate commerce. The act was so construed in Pederson v. Dalaware, Lackawana & Western Railroad Company, 229 U. S., 146. It was there said (p. 150): 'There can be no doubt that

a right of recovery thereunder arises only where the injury is suffered while the carrier is engaged in interstate commerce and while the employe is employed by the carrier in such commerce.' Again (p. 152): 'The true test always is: Is the work in question a part of the interstate commerce in which the carrier is engaged?' And a like view is shown in other cases. Mondou v. New York, New Haven and Hartford Railroad Company, *supra;* Seaboard Air Line Railway v. Moore, 228 U. S., 433; St. Louis, San & Texas Railroad Co. v. Seale, 229 U. S., 156, 158; North Carolina R. R. Co. v. Zachary, 232 U. S., 248, 256; Grand Trunk Western Ry. Co. v. Lindsay, ante, p. 42.

"Here, at the time of the fatal injury the intestate was engaged in moving several cars, all loaded with intrastate freight, from one part of the city to another. That was not a service in interstate commerce, and so the injury and resulting death were not within the statute. That he was expected, upon the completion of that task, to engage in another which would have been a part of interstate commerce is immaterial under the statute, for by its terms the true test is the nature of the work being done at the time of the injury."

We think the concluding sentence quoted in the Behrens case is conclusive of this case.

The complaint that the court erred in refusing to permit the second amendment to be filed has no merit; the plea of contributory negligence had already been made and this amendment was merely intended as a perfection of the plea by reference to certain evidence that had been given.

An examination of the instructions shows that the issue was fairly submitted, and that no just complaint can be made of them.

Perceiving no prejudicial error in the record, the judgment is affirmed.